[Cite as *In re L.P.*, 2013-Ohio-2607.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SENECA COUNTY

IN THE MATTER OF:

    L.P.,                                 CASE NO. 13-12-60

ALLEGED DEPENDENT CHILD.
                                     O P I N I O N
[SHANE POWELL - APPELLANT].


IN THE MATTER OF:

    W.P.,                                 CASE NO. 13-12-61

ALLEGED DEPENDENT CHILD.
                                     O P I N I O N
[SHANE POWELL - APPELLANT].


Appeals from Seneca County Common Pleas Court
Juvenile Division
Trial Court Nos. 21150040 and 21150041

Judgments Affirmed

Date of Decision: June 24, 2013


APPEARANCES:

    *John M. Kahler, II* for Appellant
    *Victor H. Perez* for Appellee, SCDJFS
    *Mary F. Snyder* for Appellee, Micki DeLarosa
    *Beverly and Bonifacio DeLarosa*, Appellees
    *Rebecca Herner*, Counsel for CASA Guardian Ad Litem

**PRESTON, P.J.**

{¶1} Father-appellant, Shane Powell, appeals the judgment of the Seneca County Court of Common Pleas, Juvenile Division granting the legal custody of his children, L.P. and W.P., to their maternal grandparents, Beverly and Bonisacio DeLaRosa ("the DeLaRosas"), and granting him supervised visitation for one hour, twice a month. We affirm.

{¶2} On September 7, 2011, the Seneca County Department of Job and Family Services ("SCDJFS") filed complaints alleging that L.P., eight years of age, and W.P., five years of age, were neglected and dependent children as defined in R.C. 2151.03(A)(2), 2151.04(C). The complaint concerning L.P. was assigned trial court case no. 21150040, and the complaint concerning W.P. was assigned trial court case no. 21150041. (Doc. No. 1).[1] The complaints were filed after both parents admitted they were heroin addicts and had used bath salts to get high, and after Shane was arrested on drug trafficking charges. (*Id*., West Aff., attached).

{¶3} Contemporaneous to filing the complaint, SCDJFS also requested *ex parte* orders to place the children in Beverly DeLaRosa's temporary custody under its protective supervision and order the children's parents, Shane Powell and Micki DeLaRosa,[2] to complete substance abuse treatment pursuant to R.C. 2151.3514. (Doc. No. 3). The trial court granted the *ex parte* orders that same

---

[1] The citations to the docket numbers are the same in both cases, so only one docket number will be cited.
[2] Micki is not appealing the trial court's decision and, in fact, supported SCDJFS' motion to grant her parents, the DeLaRosas, legal custody of her children. (Aug. 28, 2012 Tr. at 151).

day. (Doc. No. 4). The trial court also appointed one Guardian Ad Litem ("GAL") for both L.P. and W.P. (Doc. No. 5).

{¶4} On September 8, 2011, a shelter care hearing was held. (Doc. No. 6). The parents waived a probable cause hearing, and the trial court ordered that the minor children remain in Beverly DeLaRosa's temporary care and custody and under SCDJFS' protective supervision. (*Id.*); (Doc. No. 8); (Doc. No. 12). The trial court also determined that both parents were indigent and entitled to court-appointed counsel. (Doc. No. 6); (Doc. Nos. 9-10); (Doc. No. 12). The trial court gave Beverly discretion to allow the parents to visit the minor children provided that visitation was at a supervised visitation facility such as Patchworks House. (Doc. No. 6); (Doc. No. 12).

{¶5} On October 7, 2011, the trial court held an adjudication hearing, and the parents both admitted that L.P. and W.P. were dependent children pursuant to R.C. 2151.04(C). (Doc. No. 14). The trial court found the minor children dependent based upon the parties' admission, and, thereafter, SCDJFS dismissed the remaining allegations in the complaint. (*Id.*). The trial court ordered that the children remain in the DeLaRosas' temporary custody and under SCDJFS' protective supervision. (*Id.*). The trial court further ordered that the parents continue their respective substance abuse treatment plans. (*Id.*).

{¶6} On November 23, 2011, the trial court held a dispositional hearing. (Doc. No. 19). Shane was not in agreement with the proposed disposition recited by SCDJFS, so the court proceeded to a full dispositional hearing. (*Id*.). After presentation of the evidence, the trial court ordered that the children remain in the DeLaRosas' temporary custody and under the SCDJFS' protective supervision. (*Id*.). The trial court granted Micki visitation as agreed by the custodian, and if not agreed, visitation at Patchworks House. (*Id*.). The trial court granted Shane visitation at Patchworks House and ordered that he have no contact with the DeLaRosas. (*Id*.).

{¶7} On February 9, 2012, Shane filed a motion to order the DeLaRosas to transport the children to CROSSWAEH Community Based Correctional Facility for visitation. (Doc. No. 21).

{¶8} On February 28, 2012, the trial court held a review hearing and hearing on the motion Shane filed for visitation. (Doc. No. 22). The trial court continued its previous orders and allowed the paternal grandparents visitation at Patchworks House. (Doc. No. 29). The trial court also denied Shane's motion for visitation at CROSSWAEH, and ordered that the children's counseling continue. (*Id*.).

{¶9} On May 9, 2012, the GAL filed a motion for an in camera interview of the minor children, which the trial court granted and held the hearing on June 15, 2012. (Doc. Nos. 33-35).

{¶10} On June 21, 2012, the SCDJFS filed a motion to modify the trial court's dispositional order to award the DeLaRosas legal custody of L.P. and W.P., terminate its protective supervision, order appropriate parental visitation, and establish child support. (Doc. No. 38).

{¶11} On June 22, 2012, the paternal grandparents, Douglas and Bonnie Powell ("the Powells"), filed a motion to intervene to protect their rights and advocate for reunification of the children with their father, and son, Shane. (Doc. No. 39). The trial court scheduled a hearing on this motion for July 25, 2012; however, the Powells filed a motion to continue the hearing. (Doc. Nos. 42-43). The trial court was unable to reschedule the motion hearing prior to the previously scheduled August 28-29, 2012 annual review hearing and hearing on the motion to modify the previous disposition orders; consequently, the trial court ordered that the motion to intervene be decided on briefs. (Doc. Nos. 42, 44). On August 20, 2012, the trial court denied the Powells' motion to intervene. (Doc. No. 50).

{¶12} On August 28, 2012, the trial court held a combined annual review/motion to modify disposition hearing. The second day of the hearing was continued to October 2, 2012. (Doc. Nos. 54, 56).

{¶13} On October 12, 2012, the trial court filed entries granting SCDJFS' motion to modify disposition granting the DeLaRosas legal custody of the minor children. (Doc. No. 61). The trial court stated in the entry that child support would be determined at a subsequent hearing scheduled for November 9, 2012. (*Id.*); (Doc. No. 62).

{¶14} On October 29, 2012, Shane filed notices of appeal from the trial court's October 12, 2012 entries awarding legal custody to the DeLaRosas, which were assigned appellate case nos. 13-12-47 and 13-12-48. (Doc. No. 63).

{¶15} On November 9, 2012, a hearing on child support was held before a magistrate who subsequently recommended that Shane and Micki should each pay $335.76 per month in child support. (Doc. No. 70). The trial court adopted and approved the magistrate's recommendation on November 13, 2012. (Doc. No. 71).

{¶16} On December 4, 2012, this Court *sua sponte* dismissed Shane's appeals in case nos. 13-12-47 and 13-12-48 for lack of jurisdiction since the trial court's October 12, 2012 entry failed to dispose of child support and was not, therefore, a final, appealable order. (Doc. No. 72).

{¶17} On December 10, 2012, Shane filed notices of appeal from both the trial court's October 12th and November 13th entries in both trial court cases, nos.

Case No. 13-12-60, 13-12-61

21150040 and 21150041, which were assigned appellate case nos. 13-12-60 and 13-12-61, respectively. (Doc. No. 73).

{¶18} Shane raises two assignments of error for our review.

**Assignment of Error No. I**

**The trial court erred in placing the children in the legal custody of the maternal grandparents rather than Appellant despite the manifest weight of the evidence.**

{¶19} In his first assignment of error, Shane argues that it was not in the children's best interest to grant legal custody to the maternal grandparents, the DeLaRosas. While Shane acknowledges his initial shortcomings as a parent, he contends that the children should have been placed with him after he successfully completed the CROSSWAEH program. Shane argues that he has made significant improvements in his life, has seen several doctors and counselors to address his mental health issues, and has sought help with his drug addiction. He also contends that he is gainfully employed, has a driver's license, has remodeled the children's bedrooms, and created a playroom for them in his home.

{¶20} "A juvenile court has broad discretion in the disposition of an abused, neglected, or dependent child." *In re C.W.*, 3d Dist. No. 16-09-26, 2010-Ohio-2157, ¶ 10, citing R.C. 2151.353(A) and Juv.R. 29(D); *In re G.M.*, 8th Dist. No. 95410, 2011-Ohio-4090, ¶ 14. A reviewing court will not reverse the trial court's dispositional decision as being against the manifest weight of the evidence

if it is supported by competent, credible evidence. *In re C.W.* at ¶ 11, citing *In the Matter of Holtgreven*, 3d Dist. No. 5-95-7 (June 23, 1995), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶21} Among the trial court's dispositional options is granting legal custody of the minor child to a person identified in the complaint or in a motion filed prior to the dispositional hearing. R.C. 2151.353(A)(3). Whether the trial court is issuing its first disposition or modifying its disposition, the best interest of the child is the trial court's primary consideration. *In re C.W.* at ¶ 11 (citations omitted); R.C. 2151.42(A). The trial court must also consider which situation will best promote the child's "care, protection, and mental and physical development" understanding that a child should be separated from his family environment "only when necessary for the child's welfare or in the interests of public safety." *In re C.W.* at ¶ 11, citing R.C. 2151.01(A).

{¶22} R.C. 2151.353 does not provide factors that the court should consider for determining the child's best interests in a request for legal custody. *In re E.A.*, 8th Dist. No. 99065, 2013-Ohio-1193, ¶ 13, citing *In re G.M.*, 2011-Ohio-4090, at ¶ 16; *In re Pryor*, 86 Ohio App.3d 327, 336 (4th Dist.1993). While not specifically required, to determine the best interest of a child for purposes of R.C. 2151.353(A)(3), trial courts may be guided by the factors listed in R.C. 3109.04(F)(1) or 2151.414(D). *In re G.M.*, 2011-Ohio-4090, at ¶ 15 (either set of

factors can be applied); *In re Metz/Fonner*, 5th Dist. No. 2007CA00175, 2008-Ohio-1390, ¶ 42-46 (applying factors from both sections); *Pryor*, 86 Ohio App.3d at 336 (applying R.C. 3109.04(F)(1) factors); *In re Bradford*, 10th Dist. No. 01AP-1151, 2002-Ohio-4013, ¶ 49 (same); *In re Memic*, 11th Dist. Nos. 2006-L-049, 2006-L-050, 2006-L-051, 2006-Ohio-6346, ¶ 26 (same); *In re K.B.*, 12th Dist. No. CA2012-03-063, 2013-Ohio-858, ¶ 11 (same); *In re E.A.*, 2013-Ohio-1193, at ¶ 13 (applying R.C. 2151.414(D) factors); *In re T.A.*, 9th Dist. No. 22954, 2006-Ohio-4468, ¶ 17 (same). *See also In re Bixler*, 3d Dist. Nos. 13-05-41, 13-05-42, 2006-Ohio-3533, ¶ 25, fn. 1 (R.C. 3109.04 is sufficient to make best interest determination since Chapter 21 does not provide a definitive standard). Quite frankly, the differences in the best interest factors in these two provisions are of little consequence, since the factors are merely instructive on the question of a child's best interests. *In re G.M.*, 2011-Ohio-4090, at ¶ 16.

{¶23} The trial court held a two-day hearing on SCDJFS' motion to grant the DeLaRosas legal custody of L.P. and W.P. At the hearing, Beverly DeLaRosa testified that she is the maternal grandmother of L.P. (8 years old) and W.P. (6 years old), who have been in her temporary custody since September 11, 2011, and the mother of Micki DeLaRosa. (Aug. 28, 2012 Tr. at 12-13). Beverly testified that she resides with her husband, Bonisacio, and her other daughter, her other daughter's husband, and their child. (*Id*. at 13). Beverly testified that, when

the children were first placed in her custody, they would not make eye contact, would "space off" when asked questions, had bed wetting incidents, and L.P. would mess his pants when he was scared. (*Id*. at 14). She testified that the children "got happy" after they realized that they would be staying with her, and asked her if they would be staying with her "forever." (*Id*.). Beverly testified that the children's parents, particularly Shane, often used the children as pawns for money, things, or to settle disputes between the grandparents and the parents. (*Id*. at 15). Micki and Shane were addicted to heroin and marijuana, and Beverly took them to rehab, though they would just change their drug of choice. (*Id*. at 16-17). Beverly testified that Micki and Shane failed to provide a stable home for L.P. and W.P., and the children stated that Shane hit them, threw them, and made them watch scary movies and sexual acts. (*Id*. at 18-19).

**{¶24}** Beverly testified that Shane and Micki were married three or four years, though "[i]t wasn't a very celebrated marriage" and was a constant "battle." (*Id*. at 19-20, 23). Beverly described Shane and Micki as "partners in crime" who stole from the family to support their drug addiction. (*Id*. at 20-21). Beverly testified that Shane's physical abuse toward Micki was "ongoing" and occurred several times. (*Id*. at 21-22). She testified that, just a couple months before the children were removed, the children's paternal grandfather, Douglas Powell, called and asked her to pick up the children because they could not awaken Micki

and Shane, and L.P. had tried to open a can of soup with a butcher knife. (*Id*. at 22-23). Shane's parents would always give their unsolicited opinions to the couple, according to Beverly. (*Id*. at 23). She testified that L.P. and W.P. witnessed fights between Micki and Shane; other times, they were with grandparents. (*Id*. at 24). L.P. and W.P. told Beverly that Shane broke things in the kitchen while Micki yelled at Shane. (*Id*. at 24-25). W.P. told Beverly that Shane broke his favorite cup and later stated, "Yeah, I broke your f'ing cup, what are you * * * gonna do about it? Quit being such a big baby. It's just an f'ing cup." (*Id*. at 25). Beverly testified that Shane often told L.P. and W.P. to "stop being babies." (*Id*. at 26).

**{¶25}** Beverly testified that she would follow any court-ordered visitation, though it was difficult with her work schedule and the children's schedule. (*Id*. at 26-27). She further testified that L.P. and W.P. wanted to see Micki but not Shane, and they were comfortable with Patchworks House visitations only after they discovered a third-party would be present. (*Id*. at 28). Beverly testified that the children were tired of Shane's constant questioning during visitation, and they were concerned whether Shane and the Powells would know what they shared with the court during their in-camera interviews. (*Id*. at 29-30). Beverly testified that the children have begun to share more incidents that occurred in the home with their counselor, Mr. Kucera. (*Id*. at 31-32). Kucera is unsure how long the

children will need counseling, though Beverly would make sure they finish it; she could not say the same for Micki and Shane. (*Id.* at 32).

**{¶26}** Beverly testified that L.P. made drawings of persons, who he identified as "daddy" and "other women" and "daddy" and "mommy," in sexual positions on the playhouse at Beverly's residence. (*Id.* at 33). L.P. told Beverly that his dad would make him watch while he had sex with other women and L.P.'s mother. (*Id.*). Beverly testified that she did not think the drawings were something an eight-year-old would know since they depicted oral and anal sex. (*Id.* at 35). W.P. does not like to talk about these sexual incidents, and L.P. told Beverly that he covered W.P.'s eyes when they occurred. (*Id.*). According to Beverly, W.P. also told Kucera that Shane would tape their hands, feet, and mouth and force them to watch "Chuckie"—a horror movie about a doll who is demonically possessed with the spirit of a murderer and who kills people with knives and scissors. (*Id.* at 36). Beverly recalled hearing Shane tell the children, "Chuckie is gonna get you" or "I'm gonna make you watch Chuckie," though she did not realize the significance of these statements at the time. (*Id.*).

**{¶27}** Beverly also testified that Shane and Micki would alternate taking care of W.P. and L.P., depending on which one of them was working, though Micki worked more than Shane. (*Id.* at 38). Beverly testified that Shane applied for social security disability for an alleged mental illness, which caused him to see

and hear things, and Shane often demanded that Micki take care of him because of his alleged mental illness. (*Id*.). Beverly testified that, when Shane and Micki were abusing bath salts, they thought people were coming through the floor of their trailer. (*Id*. at 39). In the children's presence, Shane and Micki ripped off all the molding in their trailer and the rubber seals on their car, because they also thought people were planting drugs on them. (*Id*. at 39-40). Beverly testified that, about a year and a half to two years ago, Shane and Micki admitted to her that they were abusing bath salts, and Shane was eventually hospitalized to save his life. (*Id*. at 41). Beverly testified that the children describe their parents' drug abuse as a "sickness," and they would describe how their parents would smash and snort pills. (*Id*. at 41-42). L.P. and W.P. told Beverly that mommy and daddy were snorting pills, though daddy did it more often. (*Id*. at 42).

{¶28} Beverly testified that, since Micki was ordered to do visitation at Patchworks, she has only visited once, and W.P. thought she moved away or had another baby and did not want him anymore. (*Id*.). She testified that since Micki has started visiting, the children seem happier, and they missed their mom a lot. (*Id*. at 42-43). Beverly testified that the children get along great with others in her family, and they try to do things together as a family unit. (*Id*. at 43). She testified that the children love their current school, and her other son-in-law, who lives with them, is a football and basketball coach for fourth through sixth grade.

(*Id*. at 44). Beverly testified that L.P. and W.P. have become part of the community and have friends from a local church. (*Id*. at 44-45). L.P. was allowed to have a sleep-over at their house, which he really enjoyed since he was never able to have that when he lived with his parents. (*Id*. at 45). According to Beverly, L.P. and W.P. "love" where they are living and told her "it's normal now." (*Id*. at 46). Beverly testified that L.P. told her that he is taking karate because he needed to learn to defend himself against his dad and paternal grandpa. (*Id*. at 53).

{¶29} Beverly testified that she and her husband do not have any mental health issues, addictions, or disabilities. (*Id*. at 46). Beverly testified that, after they were granted temporary custody, Mr. Powell falsely accused her and her husband of being "drug addicts and crack heads." (*Id*. at 47). She further testified that, one time after a visitation period, Mr. Powell slammed his brakes right in front of her while she was transporting the children. (*Id*. at 48). Beverly testified that, one time, the Powells held Micki captive in their trailer, poking her with pencils and smacking her. (*Id*. at 49). Micki called her sister, Melinda, for help, and Mr. DeLaRosa and Melinda went over to get Micki, which caused a fight. (*Id*.). During the scuffle, Mr. Powell pushed Melinda in the chest and called her a "nigger," since Melinda dated a black man, and he tried to hit Melinda with a stick. (*Id*.). Bonisacio intervened and Mr. Powell then tried to hit the DeLaRosas'

car. (*Id*.). Apparently, the Powells filed a restraining order against the DeLaRosas after the incident. (*Id*. at 50). Beverly testified that, during his last visitation, Shane told L.P. he needed to lie, and the children are afraid to live with Shane. (*Id*. at 54-55).

{¶30} On cross-examination, Beverly testified that the boys expressed fear of Shane, but they wanted Micki to get better and come live with them. (*Id*. at 56). She testified that Shane and Micki were not currently together. (*Id*. at 59). Beverly testified that Shane was a dictator who did not allow the children to express themselves at the Patchworks House. (*Id*. at 60). Beverly identified GAL exhibit A as a photo of writing done by L.P. at their home, which stated "I whunt [sic] to have babys [sic] whith [sic] you." (*Id*. at 69-70). L.P. indicated that women who visited Shane would say this to Shane, and Shane would say this to Micki. (*Id*. at 69). Beverly identified GAL exhibit B as a photo of L.P.'s drawings on the playhouse depicting different sexual positions and a penis. (*Id*. at 70-71). She identified GAL exhibit C as a photo of L.P.'s drawing on the playhouse depicting a penis, which L.P. labeled "dick." (*Id*. at 72). Beverly identified GAL exhibit D as an enhanced photo of the same drawings depicted in GAL exhibit B. (*Id*. at 72-73). Mr. DeLaRosa witnessed L.P. drawing on the playhouse. (*Id*. at 77). She identified GAL exhibit E as a photo of L.P.'s writing inside the playhouse, which stated "You are sick" and "You look niss [sic] today."

(*Id*. at 73). Beverly testified that Shane struck the children with a closed fist on the buttocks instead of paddling them. (*Id*. at 75).

{¶31} Ruth Lape, the GAL, testified that, in the course of her investigation, she has interviewed Beverly and Bonasacio several times, and she also interviewed Great-grandma DeLaRosa, Aunts Maranda and Melinda, Uncles Jeremy and Dustin, school teachers, and the principal. (*Id*. at 79, 81-82). Lape informed the school principal, Mr. Matts, that L.P. and W.P. should not have contact with Mr. Powell, who had unexpectedly attempted to visit the children at the school, since the children did not feel safe around him. (*Id*. at 83). Lape testified that she has spoken with Kucera several times and has requested reports from him, and she has observed the Patchworks' visitations and reviewed the visitation reports. (*Id*. at 81-84). Lape testified that, during her most recent observation of Shane at Patchworks, the visitation started off really well, but later Shane started asking L.P. questions about what activities he was participating in while at the DeLaRosas'. (*Id*. at 90-91). Lape testified that Shane started yelling at L.P. to answer his questions, so she intervened and stated that L.P. might answer his questions if Shane would not yell. (*Id*. at 91-92). Lape testified that Shane then started shaking his finger at her and stated he was not yelling at L.P. and that "this has to stop and he and [she] had to have a talk." (*Id*. at 92).

**{¶32}** Lape testified that W.P. and L.P. separately informed her that Shane would tape their hands and feet together with electrical tape and make them watch "Chuckie," which W.P. said was "very, very scary." (*Id*. at 86-87). Lape identified exhibit one as a copy of her August 24, 2012 report recommending that the DeLaRosas be granted legal custody. (*Id*. at 88). Lape testified that the children have very strong feelings about never living with Shane because of abuse, and, despite Shane's efforts to improve, the children need stability. (*Id*.); (*Id*. at 95). She testified that L.P. and W.P. still fear retribution by Shane. (*Id*. at 89). Lape further recommended that Shane continue supervised visitations at Patchworks twice per month, and Shane curtail the demeaning/constant questioning; otherwise, his visitation should be further curtailed. (*Id*.). Lape also recommended that the Powells' visitation be curtailed, because the children fear Mr. Powell and do not wish to see Mrs. Powell. (*Id*.). Lape further recommended continued counseling for L.P. and W.P., believing that more instances of abuse would surface after they felt the safety of legal custody with the DeLaRosas. (*Id*.).

**{¶33}** Lape testified that, while Shane has made progress, he would continue to make comments to his children during the supervised visits, such as: "You're not going to tell me how to be a parent. You hear me, [L.P.]" and "[L.P.], I want you to know I'm doing everything I can for you. You want to hold it against me, hold it against me. Go ahead." (*Id*. at 93-94). Lape also testified that

Shane has never admitted that he has physically abused his children. (*Id*. at 94-95). Lape testified that Shane's first visitation was frightening and distressful for the children since Shane was trying to implement a new form of discipline he learned in parenting classes, where the parent counts "1, 2, 3" as a way to control a child's behavior. (*Id*. at 96). Lape testified that, because he implemented this new form of discipline, the children felt like Shane was still mean, and the visitation did not enhance his relationship with the children. (*Id*. at 97). Prior to his second visitation, Lape visited Shane at CROSSWAEH to advise him to work on his relationship with the children and not to try out his new discipline techniques during the visitations. (*Id*. at 97-98). Lape testified that Shane did not appreciate her advice and stated that it was his job to discipline the children. (*Id*. at 97).

{¶34} Lape testified that, after the September shelter-care hearing, she overheard Mr. Powell yelling to Teresa West, a SCDJFS' intake worker, in the hallway that the DeLaRosas were "crackheads," and he should have custody of the children. (*Id*. at 100, 190). Lape testified that Mr. Powell has been heated in almost every conversation she has had with him. (*Id*. at 101). She testified that Shane gets heated toward her when she explains that the children are afraid of him and when she states that he physically abused the children. (*Id*.). Micki, according to Lape, is currently serving two years of probation and will have to go through counseling for stealing her deceased great-grandfather's wedding ring.

(*Id*. at 101-102). Lape testified that she has not discussed the sexual drawings with Micki yet. (*Id*. at 103). Lape testified that her current recommendation is still the same as her filed report—to award legal custody to the DeLaRosas. (*Id*. at 103-104).

{¶35} On cross-examination, Lape testified that the children never indicated that Micki was involved with the "Chuckie" movie incidents. (*Id*. at 104-105). Lape testified that the children indicated that they love Micki; that Micki did hit them but not like Shane; and, that Micki has protected them from Shane when he was hitting them. (*Id*. at 105). Lape testified that the parents were not to discuss the future with the children during the visits, and the parents should stop questioning the children if it is upsetting to them. (*Id*. at 107). Lape testified that general questions, like "How is school?" are fine, but Shane's questions were constant, one after the other, and badgering the children. (*Id*.). Lape testified that she visited Micki while she was in jail, and she was more truthful with her about seeing abuse towards the children. (*Id*. at 110). Lape testified that, from the beginning, L.P. and W.P. indicated that Mr. Powell would hit them, cuss at them, and smoke marijuana outside while they were there. (*Id*. at 111). L.P. indicated that he felt safer when he was at the Powell's on Fridays because Grandma Powell was there, too, and L.P. stated that he did not like to be alone with Grandpa Powell. (*Id*.). L.P. also indicated that Grandpa Powell would slap his genital area

and have him "disco dance," while Grandpa Powell pinched his butt. (*Id*. at 112). W.P. also indicated that Grandpa Powell hit his genitals and called him stupid. (*Id*.).

{¶36} Lape testified that this is her third case as a GAL, and she had contact with the children at least a couple times each month, some months three to four times. (*Id*. at 113). When asked if she said that Shane was "progressing" with his parenting skills, Lape testified, "I haven't said he's progressing. I said he's taking parenting classes, perhaps, but I did not say he was progressing." (*Id*. at 115). She testified that Grandpa Powell did not allow her to interview him, and he indicated that he wanted nothing to do with CASA or the courts. (*Id*. at 116). Lape testified that Shane's questioning during visitation was inappropriate because of his tone of voice. (*Id*. at 117). Lape testified that she did not interview Grandma Powell but did have a conversation with her on the phone, and Grandma Powell made several allegations against the DeLaRosas, none of which Lape could substantiate. (*Id*. at 121-122). Lape testified that the children have difficulty sleeping, in part, due to the scary things they remember, which she figured was due, in part, to the "Chuckie" movies. (*Id*. at 124). Lape testified that she had very little contact from Micki after she was released from jail on May 20th (2012) until Beverly told Micki that Grandpa Powell may have been abusing the children. (*Id*. at 125). After that, Micki called Lape and expressed concern about the

children continuing to visit Shane and the Powells. (*Id.*). Lape testified that Micki had her Patchworks orientation on July 24th (2012), after missing four prior orientations, and has had only one visit since then with the children. (*Id.* at 126). Lape testified that Micki was not ready to have L.P. and W.P., nor would she be ready in three or six months—a fact that Micki readily admitted. (*Id.* at 129, 131). Lape identified GAL exhibits A through E as photos of drawings the children drew on the playhouse. (*Id.* at 127-128).

{¶37} Micki DeLaRosa testified that Shane and she married in 2008, and the Powells purchased them a trailer, though they were making payments. (*Id.* at 133-134). Micki testified that, in March 2009, she called the police because Shane was assaulting her, and she identified exhibit two as a copy of her sworn police statement. (*Id.* at 135). Micki explained that she had just come home when Shane woke up yelling and went crazy pushing, hitting, and punching her. (*Id.* at 136). She testified that Shane went into the children's room and broke some of their toys, punched the walls, and broke other things. (*Id.*). Micki testified that she called her mother to pick up the children since she did not feel they were safe at that time. (*Id.* at 137). Micki testified that Shane probably called his dad to come over, and it would not surprise her if Shane's father told the police he did not think the assault occurred since Mr. Powell was always protecting Shane. (*Id.*). Micki testified that she believed Shane had mental issues, and Shane was

institutionalized for a while. (*Id*. at 138-139). Micki testified that Shane and she had an addiction problem for two years, and that Shane first was addicted to pain pills, and then heroin. (*Id*. at 139). She testified that they could not keep buying OxyCotin[3] so they switched to heroin. (*Id*. at 140). When asked about the fact that Shane has provided certificates showing he completed another course in anger management, Micki testified that "Shane is good for getting certificates and still doing the same as he always has," and Shane took anger management courses after the domestic violence incident and never changed his behavior. (*Id*.); (*Id*. at 158). Micki testified that Shane could not control his anger, and she tried to protect the children from him. (*Id*. at 141).

{¶38} Micki testified that, on May 27, 2011, Shane was admitted in Tiffin Mercy Hospital due to an overdose of bath salts after law enforcement found him standing in the middle of the road. (*Id*. at 142-143). Micki testified that she was abusing bath salts with Shane in W.P.'s presence. (*Id*. at 143-144). Micki testified that she contacted law enforcement concerning Mr. Powell's behavior with the children, including spanking them with their pants down with a bare hand and hitting them in the genitals and making them dance. (*Id*. at 145). Micki testified that the drawings on the playhouse looked like her child's handwriting, but she denied ever making her children watch Shane and her have sex. (*Id*. at

---

[3] OxyCotin is "[t]he trademark name of a sustained-release form of oxycodone." 4 J.E. Schmidt, M.D., *Attorneys' Medical Dictionary*, O-148 (2004). Oxycodone is "[a] medicinal substance used as a narcotic and analgesic (to relieve pain)." *Id*.

145-146). Micki testified that she would be surprised if Shane made the children watch him having sex with his girlfriends, though she could not be certain because she worked almost every day. (*Id.* at 146). She testified that Shane would call her a "whore" in front of the children, but she denied that her children used such language. (*Id.* at 147). According to Micki, her children told her that they would never treat a woman like Shane treats her. (*Id.* at 147). Micki testified that she is going to be sentenced soon on a theft conviction, and she thinks she will get two years of community control. (*Id.* at 149-150). She testified that she already completed a drug treatment program and is no longer abusing heroin, though she knows she needs more drug treatment. (*Id.* at 150). Micki testified that her parents should have legal custody of her children, because neither she nor Shane is stable enough for the children. (*Id.* at 151-152).

{¶39} Micki testified that Shane had psychosis and was going to apply for social security disability. (*Id.* at 155). Micki testified that, since she has been in Bowling Green, she has only seen her children once. (*Id.* at 157). Micki testified that they participated in a "First Step" program for couples in 2008 before they were married due to another domestic violence incident. (*Id.* at 159). She testified that she attended "NA" in Fostoria and drug therapy at Firelands right before the children were removed from the home. (*Id.* at 160). Micki admitted that Shane and she were not completely sober during the program and did some cocaine a

time or two after enrolling. (*Id*. at 161). Micki testified that, just prior to SCDJFS filing the case, she tested positive for cocaine and marijuana. (*Id*. at 162). She recalled that the next day a case worker made an unannounced visit to their home and found drugs in the home, which Micki claimed were Shane's prescription "head pills." (*Id*. at 163). When asked why the pills were ground up, Micki testified "that's how [Shane's] gotta eat 'em, I guess, because it's hard for him to swallow." (*Id*.). Micki testified that, when the case first started, both Shane and she suggested the DeLaRosas for placement. (*Id*. at 164). Micki testified that Shane and she snorted cocaine, heroin and "pretty much everything we used." (*Id*. at 165).

{¶40} Lisa Stine, caseworker for L.P. and W.P., testified that she has been unable to consistently locate Micki; and, at one point she was living at a residence in Fostoria, which was the subject of a drug raid, and later Micki moved to Toledo. (*Id*. at 167, 170). Stine testified that Micki eventually called and gave her a Toledo address where she was living with a cousin, and then later Micki called and said she was living in a hotel; most recently, Micki indicated that she was staying with her cousin again in Toledo. (*Id*. at 170). Stine testified that Micki had an OVI offense around New Year's Eve 2012 and was required to serve jail time. (*Id*. at 171). Stine agreed that Micki should not have custody due to her outstanding legal issues and necessary drug counseling. (*Id*.). Stine identified

SCDJFS' exhibit three as the Patchworks' visitation reports. (*Id.* at 174-175). Stine testified that she believed Beverly would continue to take L.P and W.P. to supervised visitations. (*Id.* at 176). Stine testified that Jan Kucera is the therapist for the children, and she identified SCDJFS' exhibits four and five as copies of his reports concerning W.P. and L.P., respectively. (*Id.* at 176-177). Stine testified that the children need permanency and should continue their counseling with Kucera with whom they have established a good rapport. (*Id.* at 178). Stine testified that Shane was required to attend substance abuse counseling through Firelands as part of the case plan, but Firelands unsuccessfully discharged Shane since they believed he needed in-patient treatment, which Shane refused. (*Id.* a 179-180). Thereafter, Shane was convicted of trafficking in heroin and was required to participate in drug counseling in CROSSWAEH as part of his sentence. (*Id.*). Stine testified that Shane completed the CROSSWAEH program and is attending NA meetings at Dry Haven, though Shane has not provided the name of his sponsor or any attendance slips. (*Id.* at 181). She also testified that Shane completed an anger management course at CROSSWAEH, though Shane had not yet fully addressed his anger. (*Id.* at 182). Stine testified that Micki told her that Shane had completed anger management before and failed to change. (*Id.* at 184). When questioned about the children's concern about Shane's anger, Stine testified:

They have told me that their father was mean to them. That they were hit by him. Kicked by him. They also told me about the Chuckie movie; that they've seen him being mean to their mom. They have consistently said that they don't like the visits. That they don't wanna go. That they don't wanna see their father anymore. That they wanna stay with their maternal grandparents forever. (*Id.* at 183).

**{¶41}** Stine testified that the children feel safe at Patchworks since they know that their dad cannot be mean there, but the children do not want continued visitation with the Powells. (*Id.* at 184-185). Stine testified that, while he was at CROSSWAEH, Shane told her that medication he was taking caused him to be mentally disabled. (*Id.*). Shane told Stine that he would "follow his own intuition" to treat his mental disability. (*Id.*). Stine further testified that Kucera does not know when the children will finish counseling. (*Id.* at 188). Stine testified that the Powells have enabled Shane by paying his utility bills. (*Id.* at 189-190). Stine testified that she was told the day of the present hearing that Shane would be starting a new job. (*Id.* at 191). Stine testified that Shane's mother, Bonnie, would call the agency sometimes 15 to 20 times in the span of a few minutes trying to reach her to discuss the case, even though Stine had previously told her that she could only speak with Shane as a party to the case.

(*Id*. at 192-193). Stine testified that the DeLaRosas home is a safe and healthy location for the children. (*Id*. at 193-194). Stine testified that Bonisacio admitted that some of his extended family members have problems, but they are not welcome in his home. (*Id*. at 194). Stine testified that Connie Maksemetz, with Family and Children First Council, was helping Shane establish a safety plan to protect him from the DeLaRosas, but Stine never had any evidence the DeLaRosas were harassing Shane. (*Id*. at 195, 198).

{¶42} On cross-examination, Stine testified that she is recommending the DeLaRosas have legal custody of the children, because of the abuse in the home and their fear of Shane. (*Id*. at 203-204). Stine also testified that L.P. and W.P. need permanency to continue with their counseling. (*Id*. at 204). She testified that she did not ask Shane for his attendance slips from his NA meetings. (*Id*. at 206). According to Stine, Shane reported that his prescription drug, Zyprexa,[4] was causing him mental issues, not bath salts or other illegal substances. (*Id*. at 209). When she last observed Shane during visitation, Shane was constantly correcting the children on how to properly play pool, which was irritating them; however, she also testified that Shane was not being mean and praised L.P. on a couple of shots he made during the game. (*Id*. at 210).

---

[4] Zyprexa is "[t]he trademark name of an antipsychotic agent." 6 J.E. Schmidt, *Attorneys' Medical Dictionary*, 24 (Nov. 2004 Supplement).

{¶43} Thereafter, SCDJFS indicated that it had no more witnesses, and counsel for Micki indicated that she would not offer any testimony or evidence. (*Id*. at 213). Counsel for Shane indicated that he had witnesses, but he had told them they would probably testify when the hearing was continued, anticipating that SCDJFS' witnesses would take the entire day. (*Id*.). Since it was already late into the afternoon and SCDJFS had to leave by 4:15 p.m., the trial court concluded the hearing and scheduled a further hearing for October 2, 2012. (*Id*. at 213-214).

{¶44} At the beginning of the October 2, 2012 hearing, SCDJFS supplemented the record with updated Patchworks' visitation reports, which were admitted without objection. (Oct. 2, 2012 Tr. at 5-7); (SCDJFS' Ex. 6). Thereafter, counsel for Shane called Elizabeth Stanfield, a caseworker at CROSSWAEH Community Based Correctional Facility, to testify. (Tr. at 7). Stanfield testified that Shane was sent to CROSSWAEH on February 7, 2012 for possessing drugs and assaulting a police officer, and Shane successfully completed the program on July 3, 2012. (*Id*. at 7-9). According to Stanfield, Shane successfully completed 138.5 hours of drug treatment and an employment class. (*Id*. at 9-10). Stanfield testified that, in order to complete the employment class, Shane left CROSSWAEH to find work, and Shane returned to the facility as required. (*Id*. at 10). Stanfield identified Powell exhibit A as a copy of Shane's discharge summary. (*Id*. at 10-11). Shane discussed family integration during his

group sessions, but Shane was unable to visit his children while at CROSSWAEH, according to Stanfield. (*Id*. at 12). Stanfield testified that Shane responded favorably during the program and had a change of attitude. (*Id*. at 12-13).

{¶45} On cross-examination, Stanfield testified that Shane participated in a booster group, a group session which helps the participants enact the things they learned from the "Thinking For a Change" program. (*Id*. at 14). According to Stanfield, Shane needed "redirection at times" during the booster group, and she admitted that Shane was overheard stating "I ain't trying to hear this shit," by the group facilitator. (*Id*.). Stanfield also testified that Shane was "argumentative with the facilitator," even though Shane had completed anger management. (*Id*.). Stanfield testified that Shane was diagnosed with physical dependence on opiates and alcohol when he was admitted, though she was not sure whether Shane addressed his bath salts addiction. (*Id*. at 16). She also testified that Shane sought medication management. (*Id*.). Stanfield testified that Bridgette Ravera, the chemical dependency counselor and group facilitator who handled Shane's group sessions, would be able to better testify how Shane performed. (*Id*. at 17). She testified that Michael Wheeler, Shane's anger management counselor, would be able to better testify how Shane performed in anger management than her since she did not handle Shane's class. (*Id*. at 17-19). Stanfield testified that Joanie Johnson taught "Thinking For A Change" therapy group that Shane attended, and

Stanfield does not teach this course. (*Id*. at 19). According to Stanfield, the course teaches how thinking/belief patterns influence thoughts, feelings, and then actions, as well as social skills. (*Id*. at 20). Stanfield testified that, during her meetings with Shane, she discussed and role-played the concepts he learned during this program. (*Id*. at 21). She testified that, when Shane first came to CROSSWAEH, he would use anger or violence to address issues and others; whereas, afterwards Shane would calm himself by getting space or talking to someone. (*Id*.).

{¶46} Stanfield testified that one of Shane's strengths upon leaving CROSSWAEH was his network of support, which Shane primarily identified as his parents. (*Id*. at 22-23). She admitted, however, that Shane's parents would not be a proper support group if they were aggressive like Shane. (*Id*. at 23). Stanfield testified that Shane should not have continued contact with Micki or anyone currently using drugs. (*Id*. at 24). She testified that she has never observed Shane with his children. (*Id*. at 25). Stanfield testified that Shane had difficulty responding well to situations that come up immediately without adequate time to think about them. (*Id*. at 26). Stanfield testified that CROSSWAEH did not treat Shane's bipolar condition. (*Id*. at 30-31). She testified that Shane's opiate addiction will be a lifetime issue for him. (*Id*. at 32). Stanfield further testified that Shane was very sad and tearful after visiting his

SCDJFS' caseworker and CASA. (*Id*. at 33). She testified that Shane appeared to be compliant with the case plan objectives, and she would not be surprised if Shane did not accurately self-report why he was in CROSSWAEH. (*Id*. at 34). Stanfield testified that she confronted Shane with the real reason he was in CROSSWAEH—for trafficking drugs—and Shane was "open" to hearing this fact. (*Id*. at 35). She testified that Shane was not generally untruthful when he left CROSSWAEH, though she could not confirm every statement Shane made during their meetings. (*Id*.). Shane did have a rule violation for verbal aggression while at CROSSWAEH. (*Id*. at 36).

{¶47} Connie Maksemetz, a counselor at Family and Children First, testified that she was working with Shane's family as part of SCDJFS' case plan. (*Id*. at 37-38). Maksemetz testified that, after the children were removed, Shane contacted her and wanted to work on a plan toward reunification. (*Id*. at 38-39). In particular, Shane wanted to secure employment, attend parenting classes, and obtain a driver's license. (*Id*. at 39-40). Maksemetz wanted Shane to stay away from bad associations and have little free time after leaving CROSSWAEH to help him overcome his drug addiction. (*Id*. at 40). She testified that Cindy Miller, the Parenting Passport instructor, indicated that Shane was very engaged throughout the whole program. (*Id*.). Shane was also doing very well in his fatherhood program, according to Maksemetz. (*Id*. at 41). She testified that she observed

Shane with his children before they were removed, and the children seemed very happy, polite, and well-behaved in the home. (*Id*. at 41-42). Maksemetz testified that the children did not seem fearful of their parents. (*Id*.). Maksemetz testified that Shane did everything they talked about him doing, and Shane redecorated the children's bedrooms. (*Id*. at 43).

**{¶48}** On cross-examination, Maksemetz testified that Grandpa Powell actually owns the trailer but gifted it to Shane so the children would have a home. (*Id*. at 44). Maksemetz testified that the Powells had kept up the utilities and lot rent until Shane obtained employment about four or five weeks ago. (*Id*. at 45). Grandpa Powell told Maksemetz that he had been paying the utilities and lot rent previously, especially when the parents were abusing drugs, so the children would have a home. (*Id*. at 46). Maksemetz testified that Shane told her he was currently attending counseling, though she was not sure how many times Shane had been to counseling in the past. (*Id*. at 46-47). Maksemetz testified that she has seen Shane angry when SCDJFS removed the children from the home, but she has not seen Shane angry after his time at CROSSWAEH, but rather, upset about not being able to see his children more often. (*Id*. at 48-49, 70-72). Maksemetz also testified that Shane felt that the GAL was biased against him and would not consider the positive things he had done. (*Id*. at 50). Maksemetz testified that Shane indicated that he was attending NA meetings, though she could not confirm

that, and Shane is not able to attend them as often with his full-time employment. (*Id*. at 51-52). She also testified that Shane indicated that he obtained a sponsor near the end of August or beginning of September (2012). (*Id*. at 52).

{¶49} Maksemetz testified that Shane denied physically harming his children, though he admitted he neglected them when he was abusing drugs. (*Id*. at 54, 58). Maksemetz could not say whether or not Shane actually physically harmed his children, but she could testify that she has "seen a difference in his personality." (*Id*. at 55). She testified that, in her experience, children love their parents even when their parents abuse them. (*Id*. at 58). Maksemetz testified that Grandpa Powell was "very passionate" about seeing L.P. and W.P. and gets very excited and upset about it. (*Id*. at 59-60). She testified that she encouraged Shane to stay away from the GAL, and they worked on a plan to avoid confrontations with the DeLaRosas. (*Id*. at 61, 63-64). Maksemetz testified that Shane did not want to disclose his current work place to keep this information from the DeLaRosas. (*Id*. at 65-66). She testified that she did not know Shane began using alcohol at eight or nine years of age, marijuana at twelve or thirteen years of age, cocaine at twenty-one years of age, opiates at twenty-two years of age, or sedatives at twenty-five years of age. (*Id*. at 73-74). She testified that she would consider the Powells' financial help enabling behavior if they were, in fact, paying for the lot rent and the utility bills the entire time Shane and Micki were abusing

drugs. (*Id*. at 83-84). Maksemetz testified that she has seen improvements in Shane after his release from CROSSWAEH, though it has only been three months, and "a person needs longer than that to really prove themselves." (*Id*. at 85-86).

{¶50} Shane testified that he lives in a trailer park in Fostoria, Ohio. (*Id*. at 89). He described his trailer as a 1990 to 1993 trailer with a regular roof—not a tin roof—three bedrooms, one bath, a storage closet, a living room, a utility room, and a kitchen. (*Id*. at 90). Shane testified that, as of now, he is still married, and he has two children, L.P. and W.P. (*Id*.). Shane testified that he gave his children the largest bedroom to share; he would use one bedroom; and, the last bedroom he turned into a game room for the children. (*Id*. at 91). Shane testified that SCDJFS was originally going to remove the children after Micki tested positive for drugs, but SCDJFS allowed the children to stay in the home since he passed the drug test so long as Micki left. (*Id*. at 92). Shane testified that Micki could not leave the home, however, since she cared for him due to his mental illness. (*Id*.). He testified that SCDJFS made an unannounced return while the children were at school and saw his pills lying out, so they removed the children. (*Id*. at 93). Shane testified that he originally agreed that the children should be placed with Micki's parents, because he was facing drug charges and did not know how long he would be in prison; and, if that happened, Micki could get the children back from her parents. (*Id*. at 94). Shane changed his mind about the placement,

though, after he learned he would only have to serve 60 days in jail. (*Id*. at 95).

Shane testified that Micki and he were originally visiting the children every day at

the DeLaRosas, but, the GAL indicated that he could no longer visit his children

there after he had an argument with Beverly. (*Id*. at 95-96).

{¶51} Shane testified that he wanted to go to CROSSWAEH for intense

therapy, and he was successfully discharged on July 3, 2012. (*Id*. at 97). Shane

testified that, initially, he was not granted visitation with his children while he was

at CROSSWAEH but was later granted biweekly visitation for one hour; now, he

is able to visit weekly with his children, though two of the past four weeks were

cancelled. (*Id*. at 97-98). Shane testified that W.P. was opening up to him more

through the counseling, but L.P. was becoming more distant and was at an age

where he wanted to keep secrets. (*Id*. at 99-100). Shane denied ever taping his

children's hands with tape and making them watch "Chuckie." (*Id*. at 101).

Shane is currently employed through a Bowling Green temp service earning $8.50

per hour, and he works from 5:00 a.m. to 5:00 p.m., though the number of work

hours varies from week to week. (*Id*. at 102-103). Shane lives alone, and he has a

vehicle and driver's license. (*Id*. at 103). Shane testified that the children are

living with the DeLaRosas in a three bedroom house, along with their aunt, uncle,

and cousin. (*Id*. at 103-104). Shane testified that he did four voluntary sessions of

counseling with First Lutheran, and he is drug free now, except he takes three

prescription medications for anxiety, insomnia, and sleep terror. (*Id*. at 106). He testified that he did not know about the playhouse drawings, but the children would sometimes draw stick figures on the trailer walls with sharpie markers. (*Id*. at 107). Shane thought the drawings in the trailer were wrestlers. (*Id*.).

{¶52} Shane testified that he does not have a relationship with the GAL. (*Id*. at 109). Shane testified that the GAL told him he did not need to discipline his children during his visitation, and that he was out of hand disciplining the children when one child threw a toy at another. (*Id*. at 109-110). According to Shane, the GAL also wanted him to admit he physically abused his children, which he denied. (*Id*. at 110). Shane testified that the GAL was not satisfied with his parenting classes, but she would not identify any parenting classes that she would be satisfied with, either. (*Id*. at 111). Shane testified that Lisa told him that he completed his case plan objectives, and he wants his children returned to him. (*Id*. at 111-112). Shane testified that, if he did not get custody of his children, he no longer wants supervised visitation so he can take his children places. (*Id*. at 112).

{¶53} On cross-examination, Shane testified that he started to implement his new parenting discipline technique, called "1-2-3 Magic," as soon as the children entered the April 19, 2012 visitation. (*Id*. at 115). Shane testified that, before this visit, the last time he saw the children was the end of January. (*Id*.).

Shane testified that the children needed structure, so he explained the new rules of discipline, and W.P. went to a "3" automatically after he threw a toy fish at L.P. (*Id.* at 116-117). He testified that he used this new form of discipline on his children five to six times during the hour-long visitation on April 19th. (*Id.* at 119). Shane testified that, overall, the visit went well, the children played cooking and fishing games, and W.P. confessed to him that he was getting into trouble at school. (*Id.* at 121-123). Shane testified that the visitation period would go better if he knew what was going on in the lives of his children, but he does not have access to that information. (*Id.* at 124-125). He testified that he wants to go outside with his children and throw a ball around or go to the park with them. (*Id.* at 125). Shane denied abusing his children, though he admitted to spanking them with a bare, open hand on the buttocks. (*Id.* at 126-127). According to Shane, W.P. responded poorly to spanking, so he used time-outs with him; whereas, L.P. responded better to spanking. (*Id.* at 127-128). Shane testified that his own parents contacted children services to remove the children and yet never alleged any physical abuse. (*Id.* at 127). Shane denied ever making the children watch "Chuckie," and he further testified that he does not even like those types of movies. (*Id.* at 128). Shane testified that Cameron, L.P. and W.P.'s cousin, probably gave the idea of the "Chuckie" movie to his children, and Cameron would discuss that movie in the children's presence. (*Id.* at 128-129). Shane

testified that W.P. enjoyed "Killer Clown" movies, real corny movies from the 1980's where the victims turn into cotton candy, which the DeLaRosas owned. (*Id*. at 129). Shane also denied having sex with Micki or other women in front of L.P. or W.P. (*Id*. at 130).

{¶54} On cross-examination, Shane testified that, after his overdose and right around the time the children were removed from the home, his short-term memory was very, very bad. (*Id*. at 136-137). Shane testified that his current doctor has started to wean him off of his medications, and he is feeling really good. (*Id*. at 137). Shane testified that, from September 2010 to March 2011, he was being treated for back pain at the pain clinic in Findlay, and the doctor there was recommending Fentanyl[5] shots in his spine. (*Id*. at 138-139). Shane testified that his opiate addiction had become so bad that only Fentanyl, the most powerful opiate available, would ease his pain. (*Id*. at 140). Shane decided not to receive the injections, however, and left the clinic and began seeing Dr. Christian. (*Id*.). Shane testified that, about this same time, he started an IOP at Firelands to get himself off Methadone. (*Id*. at 141). Shane testified that, during his treatment at Firelands, Micki and he used cocaine at a friend's house for a couple of days until he was arrested. (*Id*. at 141-142). Shane also explained that, the day he was walking in traffic and was arrested, a neighbor called and told him that someone

---

[5] Fentanyl is "[a] medicinal substance used in the form of the citrate salt as an analgesic (to relieve pain)." 2 J.E. Schmidt, M.D., *Attorneys' Medical Dictionary*, F-56 (2004).

was breaking into his house, so he called the sheriff, and Micki and him started driving back home. (*Id.* at 142). Shane testified that they ran out of gas, so he stayed with the car, and Micki continued walking toward the trailer. (*Id.*). Shane testified that the police later arrested him for disorderly conduct since he was hallucinating from a lack of sleep and bath salts. (*Id.* at 143-145).

{¶55} Shane admitted that he tested positive for cocaine on December 7th (2011) prior to a court hearing, though he did not remember using cocaine. (*Id.* at 146-147). Shane testified that he went to a party on December 4th and was drinking alcohol and did not remember using cocaine, but Micki told him that he used cocaine at the party. (*Id.* at 147). Shane testified that December 4th (2011) was the last time he used alcohol, and he admitted alcohol was a big issue for him. (*Id.*). Shane could not recall an incident in Bowling Green where he assaulted a police officer; he could only remember waking up naked in a jail cell strapped to a chair. (*Id.* at 148). Shane testified that, after this incident, he was referred to Firelands for treatment, but they wanted to send him to their facility in Sandusky, which Shane identified as "the nuthouse." (*Id.* at 150). Shane testified that he did not want to go to this facility, so he was discharged for noncompliance, and eventually he was sent to CROSSWAEH as part of his community control. (*Id.* at 150-151). Shane testified that he was in the process of completing his case plan when he was indicted for felony trafficking. (*Id.* at 152).

{¶56} Shane testified that, if he was not granted legal custody, he wanted visitation at least every other weekend. (*Id*. at 153). Shane testified that if he was allowed to have the children for a couple days at a time, his Uncle Tom from Toledo or one of his brothers could stay with them to supervise the visitations. (*Id*. at 156-158). Shane also testified that he tries to attend NA meetings every Sunday night, and Phil Morrison is his sponsor. (*Id*. at 155). Shane testified that he is on step nine of his NA program, but he could not recall steps seven or eight. (*Id*. at 158-159). Shane testified that he did not have to report his income to the child support enforcement agency since there is no court-ordered child support. (*Id*. at 158). Shane testified that he still struggles with anxiety but not with mood swings or aggression. (*Id*. at 160). Shane admitted that he would be a drug addict for the rest of his life, and he was powerless to change that fact. (*Id*. at 167). When asked about a bruise on his arm, Shane testified that someone at Bio Life caused it when he was attempting to donate plasma. (*Id*. at 167-169).

{¶57} Thereafter, the hearing concluded, and the trial court took the matter under advisement, issuing its decision ten days later. (*Id*. at 177); (Doc. No. 61).

{¶58} The trial court's journal entry demonstrates that it reviewed the factors outlined in R.C. 3109.04(F)(1) to determine the best interest of the

children. (Oct. 12, 2012 Journal Entry, Doc. No. 61).[6] The trial court noted that Shane wanted custody of the children but failed to file a motion for custody prior to the hearing; whereas, Micki wanted her parents, the DeLaRosas, to have custody. (*Id.*, citing R.C. 3109.04(F)(1)(a)). The trial court found that the children both expressed their desire to live with the DeLaRosas and their fear of Shane and paternal grandfather, Douglas Powell. (*Id.*, citing R.C. 3109.04(F)(1)(b)). The trial court further found that the children indicated they would not be comfortable with unsupervised visitations with Shane or Douglas Powell. (*Id.*). The trial court also observed that there were significant allegations of abuse upon the children by both the father and paternal grandfather. (*Id.*, citing R.C. 3109.04(F)(1)(c)). The trial court noted that there was evidence that Douglas Powell inappropriately touched the children. (*Id.*). The trial court observed that the children were well adjusted to the DeLaRosa home, were included in family activities, and participated in karate. (*Id.*, citing R.C. 3109.04(F)(1)(d)). The trial court noted that no evidence was presented regarding any mental or physical problems with the DeLaRosas; whereas, Shane is a struggling drug addict in the midst of recovery who appeared disoriented and confused during his testimony. (*Id.*, citing R.C. 3109.04(F)(1)(e)). The trial court found that the extent of Shane's brain damage after his overdose on bath salts and medically induced coma was

---

[6] The trial court's journal entry does not specifically state the statute number but lists the factors in the statute using the subsection letters (a) through (j).

unknown at that time. (*Id.*). The trial court further observed that Shane, as well as Douglas Powell, continue to exhibit aggressive behavior toward others, including the case workers, the GAL, and the children. (*Id.*). The trial court also found that the DeLaRosas demonstrated a willingness and ability to abide by court-approved parenting time, while the father and mother have not. (*Id.*, citing R.C. 3109.04(F)(1)(f)).

{¶59} After reviewing the record in this case, we conclude that the trial court's findings are supported by competent, credible evidence; and therefore, its decision to grant the DeLaRosas legal custody of L.P. and W.P. will not be reversed. *In re C.W.*, 2010-Ohio-2157, at ¶ 11 (citations omitted). Furthermore, we cannot conclude that the trial court abused its discretion here. The evidence presented raised serious concerns with the father's past treatment of his children, and his current rehabilitation. While Shane categorically denied the allegations of physical and sexual abuse (i.e., forcing his children to watch him engage in sexual acts) towards the children, the trial court did not find Shane credible. Furthermore, W.P.'s explicit drawings and writings at the DeLaRosas' appear to substantiate the children's allegations. While Shane has made some progress, which is commendable, even Shane's own counselor and witness, Maskemetz, testified that it would take more time to determine whether or not he has truly changed. Despite his anger management courses, Shane remained aggressive

during the pendency of the case, and he struggles with responding to immediate situations—something that happens quite often with children. Furthermore, Micki, Shane's own wife, testified that Shane was good at getting certificates but never changing his behavior, and Shane did continue to use drugs (cocaine) while he was in drug therapy previously. Since the trial court's judgment is supported by competent, credible evidence and not an abuse of its discretion, we affirm the trial court's decision.

{¶60} Shane's first assignment of error is, therefore, overruled.

**Assignment of Error No. II**

**The trial court erred in ordering that Appellant Shane Powell may have only supervised visits/parenting time with the children.**

{¶61} In his second assignment of error, Shane argues that continuing his "Level 1" supervised visitation indefinitely and without any plan for a graduated increase in parenting time was not in the children's best interest. We disagree.

{¶62} As part of the trial court's dispositional order, it may issue an "order granting, limiting, or eliminating parenting time or visitation rights with respect to the child." R.C. 2151.33(B)(1)(c); R.C. 2151.35(B)(4). A trial court's decision regarding visitation will not be reversed absent an abuse of discretion. *In re L.S.*, 5th Dist. No. 12-CA-001, 12-CA-002, 2012-Ohio-3794, ¶ 57; *In re Bixler*, 2006-Ohio-3533, at ¶ 29. An abuse of discretion is more than an error of judgment;

rather, it connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St. 217, 219 (1983).

{¶63} The trial court did not abuse its discretion by continuing Shane's supervised visitation. The record reflects that the children were comfortable only with supervised visitations with Shane because they feared his aggressive behaviors. (*See* SCDJFS' Exs. 4-5). In fact, Shane has been aggressive with the children and Patchworks House staff even during these supervised visits. (SCDJFS' Ex. 3). We reject Shane's argument that the trial court's visitation order is "indefinite" since the trial court specifically retained jurisdiction over the children under R.C. 2151.353(E)(1). (Oct. 12, 2012 Journal Entry, Doc. No. 61). Therefore, Shane may ask the trial court to modify its visitation order (part of its disposition) in the future. *In re L.S.*, 2012-Ohio-3794, at ¶ 58, citing R.C. 2151.353(E)(2). As the record exists now, though, we find no abuse of discretion with the trial court's order of supervised visitation.

{¶64} Shane's second assignment of error is, therefore, overruled.

{¶65} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the trial court.

***Judgments Affirmed***

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**

-44-

Case No. 13-12-60, 13-12-61