[Cite as *In re L.W.*, 2022-Ohio-3696.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# WYANDOT COUNTY

IN RE:

L.W.,

ADJUDICATED DEPENDENT CHILD.

[LACEY W. - APPELLANT]

CASE NO. 16-22-03

**O P I N I O N**

Appeal from Wyandot County Common Pleas Court
Juvenile Division
Trial Court No. C2202013

**Judgment Affirmed**

**Date of Decision: October 17, 2022**

APPEARANCES:

    *Howard A. Elliott* for Appellant

    *Eric J. Figlewicz* for Appellee, Wyandot Co . DJFS

    *John M. Kahler, II* for Appellee, Dawn S.

**SHAW, J.**

{¶1} Mother-appellant, Lacey W. ("Lacey"), brings this appeal from the February 10, 2022 judgment of the Wyandot County Common Pleas Court, Juvenile Division, granting legal custody of L.W. to the child's paternal grandmother, Dawn S. ("Dawn"). On appeal, Lacey argues that the legal custody order was void due to a purported "lack of a statement of understanding" pursuant to R.C. 2151.353(A)(3), and that the trial court abused its discretion by granting Dawn custody of L.W. even though Lacey had significantly remedied the conditions that led to the institution of the dependency case.

*Background*

{¶2} Lacey is the mother of three children: L.W., born in January of 2013, U.S., born in March of 2014, and J.S. born in September of 2016. Greg W. ("Greg") is the natural father of L.W. (the girl who is the subject of this case), and Kyle S. ("Kyle") is the natural father of U.S. and J.S.

{¶3} At the inception of this case, Lacey was in a long-term relationship with Kyle. The couple lived together with the two children they shared, U.S. and J.S., in addition to Lacey's daughter L.W., and Kyle's daughter, K.S., who was born in September of 2009.

{¶4} On March 27, 2020, a complaint was filed alleging that L.W. was an abused and dependent child pursuant to R.C. 2151.031(B) and R.C. 2151.04(C)

respectively.[1] Allegations included that marijuana was being grown, used, and dealt in the home, that Kyle would smoke marijuana with friends who came to the home, and that Kyle would smoke marijuana in the vehicle with the windows up while the children were inside it. There were numerous allegations that the residence was "filthy," and surrounded by dead animal carcasses.

{¶5} There were also allegations that the children were given jello shots on New Year's Eve infused with vodka and marijuana; that Kyle once put L.W. in a locker and blew smoke into it forcing L.W. to inhale it; and that Kyle gave the two youngest children pop or soda if they smoked from Kyle's pipe. During the time that many of these events were allegedly occurring, Lacey was in Cleveland working at a hotel, leaving the children in Kyle's care.

{¶6} Caseworkers from children's services ("the agency") attempted to make a home visit on January 8, 2020. When the caseworkers made contact with Kyle, he became aggressive and denied access to the residence and the children. The caseworkers asked to speak to the visibly shaking children privately, but Kyle would not allow it. Kyle told the caseworkers to get off of his property or he would "get something to get agency workers off his property." (Doc. No. 1). Law enforcement was contacted and assisted with the matter while Kyle continued to yell at

---

[1] The record indicates that complaints were filed regarding the other children in the household as well; however, our record is confined to the filings related to L.W.

caseworkers. Eventually Kyle sent the children to a neighbor's home and caseworkers made contact with the upset and crying children.

{¶7} The children confirmed some of the reported allegations, describing a red gummy bear mold used to make the jello and describing how the jello made them feel dizzy, lightheaded, and tired. The older children described drug paraphernalia in the residence such as glass pipes. They also described marijuana they had observed, including the odor and small "hairs" on the plant material.

{¶8} The young child U.S. told caseworkers that it burned inside of him and made him cough when he smoked Kyle's pipe. Caseworkers asked the children what they would change if they could change anything at home and they said "no more weed" and "no more hitting." (*Id.*)

{¶9} Following the home visit, Kyle tested positive for THC and Lacey was negative for all substances. Kyle acknowledged that he used marijuana, claiming that he used it for back pain. Lacey was aware of Kyle's drug use but stated that he did not use marijuana around the children. Notably, L.W.'s natural father, Greg, was incarcerated during these alleged incidents.

{¶10} After being removed from Kyle and Lacey's care, the children were initially placed with Kyle's parents, Richard and Bette. However, for numerous reasons, the children's placement with Richard and Bette was unsuccessful. While with Richard and Bette, the children were failing in school, they were dirty and

unkempt, and Kyle and Lacey had unfettered access to the children, which conflicted with the case plan in place.

{¶11} The children were eventually removed from Richard and Bette's care in a dramatic incident wherein Richard was arrested for obstructing official business. In addition, while caseworkers and law enforcement officers were attempting to remove the children from Richard and Bette's home, Kyle was on the phone with K.S. telling the children to resist and to make agency workers and officers hurt the children in order to form the basis of a lawsuit. The children were eventually removed from the home and were placed in foster care.

{¶12} On April 17, 2020, Dawn, paternal grandmother of L.W., filed a motion to intervene pursuant to R.C. 3109.051(B), Civ.R. 24, and Juv.R. 2(Y). Dawn was subsequently permitted to intervene and she filed a motion for legal custody of L.W. Attached to the motion was an affidavit in compliance with R.C. 2151.353, also known as a "statement of understanding."

{¶13} The case proceeded to an adjudication hearing on August 10-11, 2020. After hearing the testimony presented, the trial court filed a lengthy judgment entry indicating that while there was perhaps evidence of some abuse to the children, by the time the adjudication hearing was held, L.W. and K.S. had recanted most of their initial claims and they indicated that they could not remember talking with agency caseworkers or telling caseworkers anything about their home situation.

{¶14} Given the changes in the children's stories, the trial court noted that it was significantly concerned that the children were being "coached" by Lacey and Kyle, particularly because the children used the same words as Lacey and Kyle to describe certain events. This was noted by the CASA as well. Further, the children also changed their story to claim that another grandparent (not Dawn) told them to make up the allegations that they had initially disclosed.

{¶15} The trial court found that L.W.'s and K.S.'s recantations were not credible at the adjudication hearing because the children

> **seemed self[-]satisfied with certain answers to questions as if they had passed a test. [L.W.] would start answering a question before the question was finished. [K.S.] paused a great deal to seemingly insure that she gave the right response. Each child could be observed glancing over at Lacey and/or Kyle for confirmation that each was saying what was expected for approval of their testimony.**

(Doc. No. 102).

{¶16} Further, the trial court found that the children's initial disclosures were the more credible statements because when the children disclosed to caseworkers the children "cried and shook and gulped for air." (*Id.*) The trial court found the idea that the children were lying in that moment was not credible because the children would have needed "acting lessons" as well.

{¶17} Nevertheless, despite the trial court's analysis, and its concerns with potential abuse from the children's initial disclosures, the trial court determined that

it did not receive clear and convincing evidence of abuse as defined in R.C. 2919.22. The trial court felt that the children recanting their statements and the agency's failure to test of any of the children for potentially ingesting marijuana led to a deficiency in the burden of proof. Further, the trial court noted that while individuals who often spoke of the children detailed the children's dirty and unkempt condition, none of the individuals seemed to find any suspicious marks or abrasions on the children except for one bruise on L.W. that L.W. later claimed came from a bicycle accident.

{¶18} However, although the trial court did not find clear and convincing evidence of abuse, the trial court *did* find clear and convincing evidence that the children were dependent. In making this finding, the trial court reasoned as follows:

> **The evidence revealed the children had most recently been in the primary care of Kyle [S]. It did not appear Kyle was employed. Lacey W[.] was working out of town and was often absent from the home. Lacey took a position that required her to travel a good distance to work and probably explains why she did not come home, sometimes days at a time. What was not explained was why would the mother of three of the children chose to work in a position that would remove her from her young children? If the position was lucrative it did not translate in the children living a better quality of life and if the position was not lucrative, why did Lacey not take such a position closer to home.**
>
> **\* \* \***
>
> **Kyle is an admitted marijuana user. He claims he uses it to ease back pain. Kyle brought no documentation from a medical provider that he does have an injury to his back causing pain. \* \* \* When [a caseworker] talked with Kyle about seeking**

**alternatives to marijuana for his pain, Kyle would walk out of the room. During the course of the case, Kyle always tested positive for marijuana.**

**At the hearing when questioned about alternatives to marijuana for his pain, Kyle became angry and said he did not have "an extra $400.00 to take out of his kids mouth." However, Kyle does have the money to travel to Michigan each month to purchase a sufficient quantity of marijuana to have some to smoke every morning and evening, often when he is the sole caregiver for his children and often three other related children.**

**\* \* \***

**Kyle, and by default Lacey, have seemingly given no consideration to the effect some of their decisions have on their children. On one occasion the children came to their Aunt's house who lived next door, complaining that no one was home with them. Lacey was in Cleveland and Kyle was nowhere to be found. The Aunt \* \* \* had the children for five hours before she transferred their care to another relative so she could go to work. [She] also fed the children because they were hungry. Apparently, Kyle found something more important to do than care for the children and meet their needs.**

**\* \* \***

**[Testimony also indicated that] [t]he family's yard was full of trash spewed about all around the trailer and on the porch. Witnesses testified about dead chickens and other fowl lying on the porch for days at a time. This is a disgusting environment but the children eat meals outside in this filthy place when it was too hot to stay in the trailer to eat.**

**\* \* \***

**Grandmother, Rebecca W[.], testified that the children sometimes had an "animal" odor about them and their bodies and clothes would be dirty. [L.W.] was so bad on an occasion she showered [L.W.] and gave her clean clothes. Grandmother, Dawn [] would**

**receive [L.W.] in a dirty condition and would bathe her and provide her with clean clothes. She ignored this filth as she was just grateful to have her grandchild. [Dawn] also knew the other kids were dirty and [L.W.] smelled of animal feces.**

**\* \* \***

**The most unbiased testimony concerning the condition of the children was related by the school personnel[.]**

**The School nurse testified of frequent lice checks on [K.S.] and [L.W.]. [K.S.] had thirteen positive head checks for lice in October 2019, alone. \* \* \* There was testimony that on one occasion fifty nits were picked off of [K.S.'s] head and [L.W.]. would have fifteen, twenty, to thirty nits picked off at a time. In January, the lice problem was still being addressed. As the school nurse opined, this is an exorbitantly long time for someone to have head lice with its accompanying discomfort.**

**\* \* \***

**Neither Kyle nor Lacey attended parent teacher conferences nor orientation programs. While e-mails and folders were sent to the parents, there would be little to no response to them.**

**\* \* \***

**[K.S.], as was noted by her teacher, came to school with dirty hair and clothes, two to three times a week. On one occasion [K.S.]'s odor, what was thought to be marijuana, was so repugnant that her classmates were talking about it. Her teacher sent the child to the school counselor to remove her from the situation.**

**Kyle, who had responsibilities for seven children, permitted a friend with a drug problem and domestic violence conviction to stay at his residence. \* \* \* Kyle's and Lacey's parenting style may best be described as indifferent. Their children's education is not important to them. It is evident these parents do not care if the children are dirty, smelly, or suffering from bugs – all of which will subject them to ridicule by some of their peers, eventually. \***

**\* \* These parents are indifferent to their children's appearance, their education, their health, safety, and welfare.**

(Doc. No. 102). Based on its analysis, the trial court concluded that all the children were dependent. No appeal was taken from the trial court's determination that L.W. was a dependent child.[2]

{¶19} The case eventually proceeded to a disposition hearing, which was held over multiple dates, concluding May 11, 2021. As part of the disposition hearing, an *in camera* interview was conducted with L.W. During the interview, L.W. expressed her desire to live with her grandmother Dawn. She also spoke about some of her prior life living with Lacey and Kyle, stating that marijuana was being grown by Kyle, and that Lacey and Kyle smoked cigarettes. L.W. actually stated that her siblings smoked cigarettes because they could get a pop afterward. L.W. indicated that she herself had smoked a "vape" once or twice with her mom sitting right next to her.

{¶20} As to the disposition hearing itself, testimony established that Kyle continued to use marijuana, though he claimed that he was using a legal version that lab tests could not differentiate from the illegal version. Agency testimony disputed this claim. Nevertheless, Lacey emphasized that Kyle was using a "legal" version

---

[2] Because no appeal was taken from adjudication, we quoted from the trial court's findings at length.

of marijuana, stating that she bought it for him weekly. For her part, Lacey had primarily been complying with, and fulfilling, the case plan.

{¶21} There was extensive testimony at the disposition hearing regarding the incident wherein the children were removed from their initial placement with Kyle's parents. When caseworkers arrived to remove the children, Kyle's father would not let the children go and law enforcement had to get involved. Kyle's father ended up being arrested for obstructing official business.

{¶22} Meanwhile, K.S. was on the phone with Kyle, and Kyle was telling her to resist, to make the officers and caseworkers hurt her and leave bruises so that Kyle and Lacey could sue. K.S. refused to leave the house for a long time and ultimately had to be taken to the hospital. However, once the children were removed from Kyle's parents' care, they were placed in foster care and by all indications they were doing well in their foster placements.

{¶23} On June 4, 2021, after hearing the testimony at the disposition hearing, the trial court filed a lengthy judgment entry ordering the children to remain in the temporary custody of the agency.[3] As part of the order, Kyle and Lacey's visitation with the children was increased and changed to unsupervised visitation because their supervised visitations with the children had been going well.

---

[3] L.W.'s father was in prison by the time the disposition hearing concluded. He had been released from incarceration for a time while this case was pending and he was in contact with L.W., but he was incarcerated again before disposition was completed.

**{¶24}** On August 6, 2021, the agency filed a motion requesting that Dawn be granted temporary custody of L.W. At the time of filing, L.W. was spending every other week with Dawn. A few days later Dawn filed her own motion requesting temporary custody. L.W.'s attorney then also filed a motion requesting that L.W. be placed in Dawn's temporary custody. After reviewing the motions filed, the trial court placed L.W. with Dawn.

**{¶25}** On September 21, 2021, the agency filed a motion for extension of temporary custody and review hearing.

**{¶26}** On November 3, 2021, Dawn S. filed another motion for legal custody of L.W.

**{¶27}** On January 11, 2022, a hearing was held on the agency's pending motion for extension of temporary custody and on Dawn's motion for legal custody. As part of that hearing, L.W. was again interviewed *in camera.* L.W. indicated that she was primarily staying with Dawn, though Lacey had L.W. on the weekends. L.W. indicated that she loved school, that she had lots of friends, and that she got good grades.

**{¶28}** L.W. stated that she saw her mother on weekends but she wanted to see her mother more. L.W. claimed that she did not remember anything about living with Kyle and Lacey before the case started.

**{¶29}** Testimony at the hearing indicated that Lacey had primarily met her case goals and that she had been cooperative with the agency. Although Lacey had completed the majority of her goals, she still was living with, and engaged to, Kyle, who was a major source of the problems in this case. The agency caseworker indicated that this was particularly concerning because Lacey had never acknowledged Kyle's actions as being detrimental to the children. Testimony indicated that the agency's primary concern keeping the children out of the home was Kyle not maintaining sobriety and his failure to complete anger management classes.

**{¶30}** By all accounts, testimony established that L.W.'s needs were being met at Dawn's residence. L.W. was bonded with her paternal grandparents and the cousins that she visited with while there. L.W. was doing well in school and she had good grades.

**{¶31}** L.W.'s CASA testified and recommended that Dawn be granted legal custody, feeling that it was in L.W.'s best interest. In the alternative, the CASA did not oppose continuing temporary custody with the agency.

**{¶32}** Lacey testified at the hearing that she wanted custody of L.W. She provided an overview of her housing situation, including the fact that the home had numerous animals—one of the animals being a caged raccoon in the home.

**{¶33}** After the hearing was complete, the trial court permitted the parties to file written closing arguments.[4]

**{¶34}** On February 18, 2022, the trial court filed a lengthy judgment entry granting Dawn's motion for legal custody of L.W. In granting Dawn's motion, the trial court first indicated that it had to determine "whether keeping L.W. in her current situation where she is flourishing, should be disrupted in order to fulfill her recently stated desire to live with her Mother." (Doc. No. 204).

**{¶35}** In analyzing this issue, the trial court noted that L.W. had previously vacillated between wanting to live with Lacey and wanting to live with Dawn. However, the trial court felt that L.W.'s recent desire to live with Lacey could have been the product of "undue influence." (*Id.*)

**{¶36}** The trial court noted that during her *in camera* interview L.W. expressed her desire to be a veterinarian and L.W. indicated that she loved animals. Lacey and Kyle had accumulated a "menagerie" of animals at their house, including an "illegally" caged raccoon, perhaps as an enticement to L.W. (*Id.*) In fact, L.W. specifically expressed to the trial court that one of the reasons she wanted to be with Lacey was to spend more time with the animals.

**{¶37}** Aside from the raccoon, the trial court felt that there were other issues with the animal situation in Lacey and Kyle's home. L.W. had witnessed a neglected

---

[4] Dawn attached another written statement of understanding to her closing argument.

-14-

guinea pig that had to gnaw off its own leg because it was caught in its cage. The trial court felt that the guinea pig incident and the treatment of animals in general (such as the caged wild animal) was reminiscent of the treatment Lacey and Kyle gave animals in their care prior to the children's removal.

{¶38} In addition to the "menagerie" of animals, the trial court reasoned that there were other incidents of potential "bribery" performed by Lacey and Kyle. For example, L.W. had been given Christmas gifts by Lacey but L.W. was told there was no space to transport the gifts to Dawn's residence in Lacey's crowded vehicle even though one gift was a ring and another was a microphone. The trial court found this reasoning specious, noting that Lacey seemed to be making it so L.W. could only have these gifts while with her. Given all of the circumstances, the trial court determined that there was no doubt that Lacey loved her child, but the trial court reasoned that L.W.'s expressed desire to live with her mother might not have been free from manipulation.

{¶39} Moreover,

**[t]he Court finds unbelievable L.W.'s claim that she cannot remember anything about her life with Mother and Kyle before her removal from their care (with an obvious exception). The Court also finds fantastic L.W.'s claim that her best friend lives in the school district affiliated with Mother's residence, but she cannot even remember her best friend's name. These statements do not make sense, which means they are probably not true. Therefore, the Court may not put much stock in the wishes of L.W.**

**Further, there is concern that L.W. may have been coached about what to say. The one incident L.W. allegedly remembers from her past life with Mother and Kyle is telling. Initially, L.W. reported that she was locked in a box or a trunk and Kyle blew marijuana smoke in it. L.W. was understandably terrified.**

**At the most recent in camera interview, L.W. spontaneously recanted the dark version of this event and explained that it was a game and it was fun. Dawn [] also testified that L.W. recently came home from a visitation with her Mother and blurted out that the incident with the box was a game and all fun. However, even Mother contradicts her child's characterization of the event. Pursuant to Mother's testimony, L.W. was in a box/trunk that fell over and L.W. could not get out. If true, this would be a frightening experience for a young child and not a game. The fact that L.W., without prompting, brings up the subject and then dismisses the incident as a fun exercise, shows L.W. has a very poor memory or she is being dishonest. As L.W. has been characterized as a bright child, the Court in considering L.W.'s demeanor when recounting the event and manner in which she remembers it, suggest she is being dishonest and such dishonesty may well have been coached. These children have been coached before. Further, the seeming urgency accompanying L.W.'s telling of the incident, coupled with the spontaneity in bringing up this matter, made it seem as if L.W. had this event on her list of things to do. L.W. seemed very satisfied with herself in relaying this version of events to the Court. Once L.W. made this revelation, she proceeded to talk about other unrelated matters. However, the Court believes the child's first version of the event, as it was the version related closest in time to the actual incident and before it became a part of this case.**

(Doc. No. 204).

**{¶40}** The trial court thus discounted L.W.'s expressed desire to live with her mother, and shifted to analyzing the ongoing deficiencies of Lacey and her chosen fiancé. In doing so, the trial court emphasized that Kyle possessed a poor

temper and an aggressive nature. Further, the trial court was concerned that Lacey would be a poor candidate to act as L.W.'s protector in the face of Kyle's wrath. "Mother makes excuses for Kyle's bad behavior and rarely intervenes to correct him or object to it. Mother, throughout these proceedings has been rather passive, even though having her children returned to her is at stake." (*Id.*)

**{¶41}** The trial court also emphasized Kyle's failure to complete his case plan. During the pendency of the case Kyle had to get a second substance abuse assessment because he lied to the test administrator and claimed he had not used marijuana despite all his positive tests to the contrary. Kyle had not maintained his sobriety for a significant length of time and he had not completed his anger management classes.

**{¶42}** The court determined, "Neither Mother nor Kyle have accepted any responsibility for their current circumstances." The court noted, "Mother wants L.W. returned to her, but she also stands with Kyle even though she must realize he is an obstacle to having L.W. returned."

> **Mother is, as stated, allowed to choose her mate, but his presence must be considered by the Court in deciding what is in L.W.'s best interest. Kyle and perhaps Mother were blinded with anger when they told L.W. and her half siblings to resist law enforcement and "let them hurt you" when the group was being removed and taken to foster care. * * * This is but one example of why Kyle needs anger management and why it is disconcerting that Kyle is resistant to receiving it.**

(Doc. No. 204).

**{¶43}** The trial court concluded its analysis by emphasizing that L.W. needed stability and that the ongoing waiting pattern did not contribute to stability. The trial court found that the evidence established that in Dawn's home L.W. received love, guidance, attention, and structure, whereas Lacey's home was "chaotic," even if now clean compared to what it once was. (*Id.*)

**{¶44}** Moreover, the trial court determined that by all accounts Dawn would continue to facilitate interaction between L.W. and her natural parents. After determining that it would be "unconscionable" to leave L.W. in "the ongoing no man's land of this case without a named permanent custodian," the trial court determined it was in L.W.'s best interest that Dawn be granted legal custody of L.W. (*Id.*) It is from this judgment that Lacey now appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**Where the trial court awards legal custody [to] a non-parent of a minor child in an abused, neglect or dependency case, such order is void when the trial court fails to have them execute the statement of understanding for legal custody as specified, at minimum, in Ohio Revised Code §2151.353(A)(3).**

**Assignment of Error No. 2**
**When the parent has complied with the obligations of the Children Services case plan and significantly remedied the conditions leading to the institution of the case, it is abuse of the discretion for the court to not award the parent custody of their child.**

*First Assignment of Error*

**{¶45}** In her first assignment of error, Lacey argues that the trial court erred

by awarding Dawn custody of L.W. without having a properly filed "statement of

understanding."

Controlling Statute

**{¶46}** Lacey contends that Dawn S. was not in compliance with R.C.

2151.353(A)(3) before she was awarded legal custody of L.W. Revised Code

2151.353(A)(3) reads as follows:

> **(A)   If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:**
>
> **\* \* \***
>
> **(3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings. A person identified in a complaint or motion filed by a party to the proceedings as a proposed legal custodian shall be awarded legal custody of the child only if the person identified signs a statement of understanding for legal custody that contains at least the following provisions:**
>
> **(a)   That it is the intent of the person to become the legal custodian of the child and the person is able to assume legal responsibility for the care and supervision of the child;**
>
> **(b)   That the person understands that legal custody of the child in question is intended to be permanent in nature and that the person will be responsible as the custodian for the child until the**

**child reaches the age of majority. Responsibility as custodian for the child shall continue beyond the age of majority if, at the time the child reaches the age of majority, the child is pursuing a diploma granted by the board of education or other governing authority, successful completion of the curriculum of any high school, successful completion of an individualized education program developed for the student by any high school, or an age and schooling certificate. Responsibility beyond the age of majority shall terminate when the child ceases to continuously pursue such an education, completes such an education, or is excused from such an education under standards adopted by the state board of education, whichever occurs first.**

**(c)   That the parents of the child have residual parental rights, privileges, and responsibilities, including, but not limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support;**

**(d)   That the person understands that the person must be present in court for the dispositional hearing in order to affirm the person's intention to become legal custodian, to affirm that the person understands the effect of the custodianship before the court, and to answer any questions that the court or any parties to the case may have.**

Analysis

**{¶47}** Although Lacey argues that Dawn did not file an appropriate statement of understanding prior to being granted legal custody of L.W., Lacey acknowledges in her brief that Dawn attached an "attempt" at a proper statement of understanding to her initial motion for legal custody in this case. However, Lacey contends that the initial "attempt" was insufficient.

**{¶48}** Further, Lacey acknowledges that Dawn attached *another* "attempted" statement of understanding to her written closing argument, but she contends that this attachment was also insufficient, as exhibited by the trial court's determination that the attachment was insufficient to satisfy R.C. 2151.353(A)(3) in the trial court's judgment entry.[5] According to Lacey's interpretation of the record, Dawn did not execute a sufficient "statement of understanding," thus the trial court's award of legal custody to Dawn was erroneous.

**{¶49}** Lacey does acknowledge that there is case authority to suggest that in the absence of a proper written statement of understanding, testimony from the proposed legal custodian could satisfy R.C. 2151.353(A)(3). *In re E.Z.-S.*, 6th Dist. Fulton No. F-18-006, 2019-Ohio-1177, ¶ 26. However, again, Lacey contends that Dawn's testimony at the final hearing did not meet the standards set forth in R.C. 2151.353(A)(3).

**{¶50}** In our own review of the matter, we note that Lacey did not specifically make any objections regarding the statement of understanding at the trial court level, thus she has waived all but plain error. *In re E.Z.-S.* at ¶ 26. Notwithstanding Lacey's lack of objection to any issues regarding the statement of understanding, the trial court did find that the *second* statement of understanding was deficient that was attached to Dawn's closing argument. However, no

---

[5] The trial court did not mention the originally filed statement of understanding in its judgment entry.

objections or arguments were made regarding the *first* statement of understanding filed in the record.

**{¶51}** The record establishes that when Dawn originally filed a motion for legal custody, the motion contained an attached "Affidavit in compliance with O.R.C. § 2151.353" that reads as follows:

**Dawn Stacy, having been duly sworn, says:**

1. **It is her intent to become the legal custodian of the child, [L.W.] and she is able to assume legal responsibility for the care and supervision of the child;**

2. **That she understands the following**

2.1 **that legal custody of the child is intended to be permanent in nature and that she will be responsible as the custodian for the child until the child reaches the age of majority;**

2.2 **that responsibility as custodian for the child shall continue beyond the age of majority if, at the time the child reaches the age of majority, the child is pursuing a diploma granted by the board of education or other governing authority, successful completion of the curriculum of any high school, successful completion of an individualized education program developed for the student by any high school, or any age and schooling certificate; and**

2.3 **that responsibility beyond the age of majority shall terminate when the child ceases to continuously pursue such an education, completes such an education, or is excused from such an education under standards adopted by the state board of education, whichever occurs first.**

3. **That she understands that both parents of the child have residual parental rights, privileges, and responsibilities, including but not limited to, the privilege of reasonable**

> **visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support;**
>
> **4.      That she understands that she must be present in court for the dispositional hearing in order to affirm the person's intention to become legal custodian, to affirm that she understands the effect of the custodianship before the court, and to answer any questions that the court or any parties to the case may have.**

(Doc. No. 21).

**{¶52}** A careful reading of this originally filed statement of understanding shows that it is in *direct compliance* with R.C. 2151.353(A)(3), mirroring the language required in the statute. For this reason alone we could overrule Lacey's assignment of error.

**{¶53}** However, we emphasize that in addition to the existence of this early-filed statement of understanding, Dawn testified at the final hearing that she had again read a statement of understanding prior to testifying, that she understood it, that she was willing and capable of being L.W.'s legal custodian, and that she believed it was in L.W.'s best interest. Dawn testified that she understood L.W.'s parents would have residual rights, particularly visitation, and Dawn indicated that she was ready to facilitate that visitation.

**{¶54}** "[T]he legislative purpose of the signed statement of understanding under R.C. 2151.353(A) is to help insure that prospective legal custodians are apprised of the significant responsibilities they will undertake." *In re W.A.*, 5th Dist.

Muskingum No. CT2013–0002, 2013–Ohio–3444, ¶ 16. The record before us shows that Dawn understood the responsibility she was undertaking. Under these circumstances we do not find any error, let alone plain error.

**{¶55}** We note that any confusion that exists regarding the statement[s] of understanding in this case appears to be because Dawn attached a *second* statement of understanding to her written closing argument in this matter. In its judgment entry, the trial court stated that this *second* statement of understanding was deficient without mentioning the originally filed statement of understanding. However, the later-filed statement is simply superfluous given the clear compliance with the statute contained in our record.

**{¶56}** In sum, the record contains a properly filed statement of understanding from Dawn. Any argument to the contrary by Lacey is not well-taken, and to the extent that the trial court determined that the later-filed, superfluous statement of understanding was deficient, that is irrelevant. For these reasons, Lacey's first assignment of error is overruled.

*Second Assignment of Error*

**{¶57}** In her second assignment of error, Lacey argues that the trial court erred by granting legal custody of L.W. to Dawn in this matter because Lacey had fulfilled her obligations under the case plan and she had remedied the conditions leading to the institution of this case.

Standard of Review

**{¶58}** We review the grant or denial of a motion for legal custody under an abuse-of-discretion standard. *In re C.S.*, 3d Dist. Paulding No. 11-21-07, 2022-Ohio-2451, ¶ 15. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

Relevant Authority

**{¶59}** Legal custody is defined as

**a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities. An individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by any section of the Revised Code or by the court.**

R.C. 2151.011(A)(21).

**{¶60}** Importantly, "the award of legal custody is 'not as drastic a remedy as permanent custody.'" *In re J.B.*, 3d Dist. Allen No. 1-15-79, 2016-Ohio-2670, ¶ 32, quoting *In re L.D.*, 10th Dist. Franklin No. 12AP-985, 2013-Ohio-3214, ¶ 7. Unlike granting permanent custody, the award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities. *In re C.R.*, 108 Ohio

St.3d 369, 2006-Ohio-1191, ¶ 17. Significantly, the parent can generally petition the court for a custody modification in the future. *In re L.D.* at ¶ 7. Thus, "a parent's right to regain custody is not permanently foreclosed." *In re B.P.*, 3d Dist. Logan No. 8-15-07, 2015-Ohio-5445, ¶ 19, citing *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 12.

**{¶61}** The standard a juvenile court uses in making its determination in a legal-custody proceeding, by "preponderance of the evidence," is less restrictive than a permanent-custody proceeding, which requires proof by "clear and convincing evidence." *In re C.S.*, 3d Dist. Paulding No. 11-21-07, 2022-Ohio-2451, ¶ 19. "'Preponderance of the evidence' means evidence that is more probable, more persuasive, or of greater probative value." *In re M.G.*, 3d Dist. Allen No. 1-18-54, 2019-Ohio-906, ¶ 7, quoting *In re J.B.*, 3d Dist. Allen No. 1-15-79, 2016-Ohio-2670, ¶ 33.

**{¶62}** Importantly, at a dispositional hearing involving a request for legal custody, the focus is on the best interest of the child. *In re P.S.*, 5th Dist. Stark No. 2012CA00007, 2012-Ohio-3431, ¶ 31, citing *In re C.R.* at ¶ 10; *In re B.P.* at ¶ 19. Revised Code 2151.353(A)(3) does not list specific factors a court should consider in deciding what is in the child's best interest pursuant to the requested disposition of legal custody. *In re B.P.* at ¶ 20, citing *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23, citing *In re Fulton*, 12th Dist. Butler No. CA2002-09-236,

2003-Ohio-5984, ¶ 11. However, although, no specific factors must be followed in a case involving the dispositional alternative of legal custody, we have previously concluded that juvenile courts may be guided by the factors listed in R.C. 2151.414(D)(1) (the permanent-custody factors) or R.C. 3109.04(F)(1) (factors employed in private-custody disputes) since they are both purely instructive. *See In re L.P.*, 3d Dist. Seneca Nos. 13-12-60 and 13-12-61, 2013-Ohio-2607, ¶ 22.

**{¶63}** In addition to the foregoing factors, the juvenile court must also liberally interpret and construe R.C. Chapter 2151 so as to effectuate the General Assembly's express purpose when considering which situation will best promote the child's "care, protection, and mental and physical development," understanding that the child should only be separated from his or her parents "when necessary for the child's welfare or in the interests of public safety." *In re C.W.*, 3d Dist. Wyandot No. 16-09-26, 2010-Ohio-2157, ¶ 11, citing R.C. 2151.01(A).

Analysis

**{¶64}** Lacey argues that the trial court erred by awarding Dawn legal custody of the children even though she had completed her portion of the case plan. She contends that she had cooperated with the agency throughout the pendency of the case and she contends that Kyle had also made progress on the case plan. Lacey argues that even according to the agency caseworkers and the CASA, Lacey had

-27-

acquired clean, stable housing, that L.W. had expressed her desire to live with Lacey, and that L.W. was bonded with her siblings.

**{¶65}** Lacey also emphasizes that although Kyle had not been drug-free for long, he did have multiple clean drug screens. She also claims that Kyle had attempted to take anger management classes but he had internet difficulty with the remote classes and he was attempting to register for a new class. Given all of these improvements, Lacey argues that the trial court erroneously awarded legal custody of the children to Dawn.

**{¶66}** In reviewing the matter, we stress the fact that each and every argument and improvement cited by Lacey was carefully considered by the trial court in its lengthy judgment entry awarding legal custody of L.W. to Dawn. The trial court weighed the improvements made by Lacey, and the minimal improvements made by Kyle, against numerous factors.

**{¶67}** For example, the trial court was concerned with Lacey's ongoing enabling of Kyle's behavior, Lacey and Kyle's apparent coaching of L.W., and Lacey and Kyle's choice to cage a wild animal in the house. The trial court established that it was particularly concerned with Lacey's enabling of Kyle's behavior during the incident when the children were removed from Kyle's parents' home. During that incident Kyle encouraged the children to fight back and get hurt

to promote his own agenda, which showed terrible judgment. The record does not show any acknowledgment by Lacey that this was improper.

**{¶68}** Furthermore, multiple witnesses testified to how well L.W. was doing in Dawn's care. Her grades had improved to the point that she was on the honor roll. She was consistently clean and cared for, and provided with plenty of attention. Given that L.W. was doing poorly in school in Lacey and Kyle's care, and given that she was often dirty and unkempt in their care, which included the *substantial* lice issues, L.W. was undoubtedly flourishing with Dawn, which spoke favorably toward Dawn being granted legal custody of L.W. *See In re P.S.*, 5th Dist. Stark No. 2012CA00007, 2012-Ohio-3431, ¶ 31 (holding that the focus in legal custody circumstances is on the *child's* best interests).

**{¶69}** It is also important to note that Dawn was ready and willing to facilitate interactions between L.W. and her mother. Dawn maintained a suitable residence and was providing a stable, structured environment. The CASA, who had been involved in this case for a significant period of time, felt Dawn should be granted legal custody and the agency was also not opposed to that option.

**{¶70}** In sum, the trial court dealt with these parties for nearly two years. The trial court interviewed L.W. *in camera* multiple times and sat through *numerous* lengthy hearings with the parties. The trial court was concerned of the detrimental impact that could occur by leaving L.W. in limbo without a permanent legal

custodian and making her switch schools again. We do not find under these facts and circumstances that the trial court abused its discretion by awarding Dawn legal custody of L.W., particularly where Lacey retains residual rights. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 17.  For all of these reasons, Lacey's second assignment of error is overruled.

### *Conclusion*

{**¶71**} For the foregoing reasons Lacey's assignments of error are overruled and the judgment of the Wyandot County Common Pleas Court, Juvenile Division, is affirmed.

**Judgment Affirmed**

**MILLER and WILLAMOWSKI, J.J., concur.**

**/jlr**